IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 25, 2006 Session

## STATE OF TENNESSEE v. ROSHAD ROMANIC SILER

**Appeal from the Criminal Court for Roane County**
**No. 12878    E. Eugene Eblen, Judge**

---

**No.E2005-01201-CCA-R3-CD - Filed January 3, 2007**

---

Following a jury trial, the appellant, Roshad Romanic Siler, was convicted of three counts of the sale of a counterfeit controlled substance, a Class E felony.  The trial court sentenced the appellant as a Range I, standard offender to concurrent sentences of one year for each conviction, but suspended the sentences and placed the appellant on community corrections.  The appellant challenges the sufficiency of the evidence and an evidentiary ruling made by the trial court on appeal.  Because we determine that the evidence was insufficient to support the appellant's convictions, we reverse and dismiss.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed and Dismissed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which, JAMES CURWOOD WITT, JR., J., joined; and THOMAS T. WOODALL, J., filed concurring in part and dissenting in part.

F. Chris Cawood, Kingston, Tennessee, for the appellant, Roshad Romanic Siler.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledlsoe, Assistant Attorney General; J. Scott McCluen, District Attorney General and D. Roger Delp, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In October of 2003, the appellant was indicted by the Roane County Grand Jury with three counts of sale of a counterfeit controlled substance and three counts of delivery of a counterfeit controlled substance.  The indictments stemmed from a summer 2003 undercover video surveillance operation in Triangle Park, a public park located within the city limits of Harriman, Tennessee.

Prior to trial, the appellant filed a motion in limine seeking to exclude testimony from the State about the ongoing drug operation, the names of "other drug suspects or those who have been

convicted or arrested for drug offenses" as a result of the ongoing drug operation, and the fact that Triangle Park is a "known drug area." The trial court denied the motion without comment.

At trial, Chris Mynatt, a detective with the Harriman Police Department, testified about the drug operation that took place at Triangle Park during the summer of 2003. Detective Mynatt is the director of the drug unit. According to Detective Mynatt, two cameras were placed on the perimeter of the park and were operated by remote control. The cameras were not equipped with audio transmitters.

Detective Mynatt testified that he was familiar with crack cocaine and, while operating undercover, had bought crack cocaine from various individuals on many occasions. Detective Mynatt stated that he had known the appellant since approximately 1996.

During Detective Mynatt's testimony, the State played a portion of the video tape filmed at Triangle Park on July 14, 2003. The tape showed a man, whom Detective Mynatt identified as the appellant, sitting on top of a Chevrolet Caprice. According to Detective Mynatt, the appellant held a plastic bag containing a "white rock-like substance." At that point, the video tape shows two females in a car approach the area, exit their vehicle and walk toward the appellant, appear to converse with him for a few seconds, and then return to their car. A man, whom Detective Mynatt identified as Lamar Cooper, held out his hand, and the appellant placed some of the "white rock-like substance" into Mr. Cooper's hand. Detective Mynatt described that Mr. Cooper then gave the substance back to the appellant. The appellant then waved at the car with the two females, and the women drove up and stopped beside the appellant's car. At that point, the appellant handed some of the substance to the driver of the car through an open car window. Detective Mynatt opined that the driver then handed the appellant some money and then drove off.

The next frame of the video depicted an exchange between Mr. Cooper and the appellant. Mr. Cooper appeared to hand the appellant some money. Then, according to Detective Mynatt, the appellant took some of the "white rock-like substance" out of the baggie and gave it to Mr. Cooper.

In the next frame, the appellant sat inside the Chevrolet Caprice. A woman walked up to the driver's side door, reached into her back pocket, and pulled out what appeared to Detective Mynatt to be cash. The woman handed the "cash" to the appellant, and the appellant placed what was described by Detective Mynatt as a "white rock-like substance" into the woman's hand. The woman then walked away.

During a portion of the video tape, an exchange occurred between the appellant and Mr. Cooper in the presence of, and during some conversation with, a soda-sipping woman accompanied by a child.

The surveillance of the Triangle Park area lasted for approximately three months. Detective Mynatt stated that the police officers were generally known in the community, even when working

undercover, which made surveillance of the area difficult, if not impossible. Detective Mynatt described the location of Triangle Park and opined that it was "difficult to watch because it's [sic] basically kind of sits on top of a hill. And there's no way to really get in there and observe things without being seen yourself. It's surrounded by residents [sic]. So this kind of operation - or this area is ideal for this type of operation."

Detective Mynatt stated that the main purpose of the investigation was to gather information concerning the activities of the park's patrons when officers were not present. Detective Mynatt said that audio equipment had recently proven ineffective because drug sellers generally avoided engaging in conversation during a transaction. Detective Mynatt stated, "and it got to the point where [the undercover officers] could buy drugs all day long, but we weren't getting anything that we could use evidentiary wise because there was nothing on the - - just an audio tape, a blank audio tape, essentially." Officer Mynatt said that typically the buyer would show a sum of money to the seller, and the seller would give the buyer a controlled substance.

Detective Mynatt described Triangle Park as a place where one could buy crack cocaine. Specifically, he stated, "Generally you don't come into the Triangle Park area unless that's what you're looking for, unless you live up there. You're either a customer or a seller."

On cross-examination, Officer Mynatt admitted that he did not know whether the substance sold by the appellant was a counterfeit controlled substance or cocaine. Officer Mynatt also admitted that the officers did not interview anyone else who was present during the three transactions except for the two women in the automobile who appeared at the beginning of the video tape. Officer Mynatt testified that a K-9 officer stopped the two women about three miles away from Triangle Park approximately twenty to thirty minutes after they purchased the substance from the appellant. No drugs or drug paraphernalia were found during a search of the vehicle. The women denied being in Triangle Park earlier that day, and the police officer decided not to pursue the matter because the police department did not want to reveal the presence of the surveillance cameras at the park at that point in time.

## Sufficiency of the Evidence

On appeal, the appellant argues that the evidence was insufficient to support his three convictions for selling a counterfeit controlled substance because there was no evidence that the substance sold was, in fact, counterfeit. The appellant also contends that the State failed to show a representation by the appellant that the substance he was selling was a controlled substance, that, is, cocaine. The State argues that a jury could infer from the evidence presented at trial that the appellant "sold a substance, which he represented to be a controlled substance, similar in appearance to crack cocaine."

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all

conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Further, questions concerning witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The appellant was convicted of three counts of sale of a counterfeit controlled substance. According to Tennessee Code Annotated section 39-17-423(a), it is an offense for a person to sell, deliver or distribute "a substance which is represented to be a controlled substance and which is substantially similar in color shape, size, and markings to a Schedule I, II, III, or IV controlled substance, in order that the substance may be sold as a controlled substance."

The appellant challenges the sufficiency of the evidence by contending that the lack of audio memorialization of the transaction negates a finding that the appellant made a "representation" concerning the substance sold." A "representation" is a presentation of a fact which is made either by words or conduct. Black's Law Dictionary 1303 (7th ed. 1999). In a similar situation, a panel of this Court concluded that, even in the absence of a verbal affirmation or representation by a defendant, the defendant's actions can support an inference that the merchandise sold was understood to be a controlled substance. State v. Jeffrey Antwon Burns, No. M1999-01830-CCA-R3-CD, 2000 WL 1520261, at *3 (Tenn. Crim. App., at Nashville, Oct. 13, 2000), perm. app. denied, (Tenn. Apr. 23, 2001). In Jeffrey Antwon Burns, a confidential informant solicited a sale of drugs from the defendant. The defendant approached the confidential informant, removed a substance from his mouth, and exchanged the substance for the twenty dollars offered by the confidential informant, all without uttering a word. Id.

The court observed:

The crux of the issue presented is one of intent: The defendant obviously intended to sell something for twenty dollars, and, according to expert testimony, the sold item greatly resembled crack cocaine. The remaining question is, absent affirmation or representations from the defendant, whether he intended that his merchandise be understood as a controlled substance. We conclude that the jury heard sufficient proof to conclude that such was the defendant's intent.

-4-

. . . .

> In this case, the jury could certainly have inferred from the defendant's actions that he intended to sell a controlled substance. Clearly, the defendant's manner of concealment, manner of delivery and, in fact, his silence, support the proposition that he intended to sell an unlawful substance. Further, trial testimony established that the substance sold resembled crack cocaine in size, color and shape. Finally, the testimony of the experienced CI [confidential informant] which described the actions of the defendant as well as his knowledge of similar transactions supported the inference that this transaction was intended as a drug sale. For these reasons, we conclude that sufficient evidence supported the verdict.

Id. at *3. Looking at the facts of the case herein, we conclude that Jeffrey Antwon Burns is distinguishable. In Jeffrey Antwon Burns, the police utilized a confidential informant. The exchange was not monitored by video equipment, and although it was monitored by audio equipment, the participants did not speak during the exchange. The informant testified that he held up two fingers and mouthed the word "twenty" to indicate his offer to purchase crack cocaine. the defendant approached the informant's vehicle, nodded, and "pulled a 'rock' from his mouth, and exchanged it" for twenty dollars. The rock was recovered and tested. A TBI technician testified that, although the rock resembled crack cocaine in size, shape, and color, it tested negative for a controlled substance.

In the case herein, the video showed that the appellant handled a small bag from which he withdrew some round, pill-sized, light-colored items. The videotape shows the items to be light - colored and marble-sized or smaller. Although they appear to be round, it is difficult to tell their actual shape. It is also impossible to tell from the video tape what the hardness or texture of the items was. The appellant and Mr. Cooper appear to exchange one or more items from the bag. A few minutes later, the appellant exchanges what appears to be wads of paper, perhaps money, but not obviously so, with Mr. Cooper. There was another exchange between the appellant and the two women in the car, but it is not entirely clear what the women handed the appellant in exchange for items from the bag. There was no testimony about any communication between the appellant and the "customer." Neither the substance exchanged nor any items remaining in the appellant's bag were recovered, despite that the videotaping of the activity was being contemporaneously monitored.

We conclude that in the absence of evidence of conversation or testimony of an informant who actually participated in a sale, in which the appellant represented that items he possessed were cocaine, the sufficiency of the evidence is a question of purely circumstantial evidence. Of course, a criminal offense may be established exclusively by circumstantial evidence. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995). However, the trier of fact must be able to "determine from the proof that all other reasonable theories except that of guilt are excluded." Jones, 901 S.W.2d at 396; see also, e.g., Tharpe, 726 S.W.2d at

900. We do not know from the evidence presented what the substance the appellant possessed actually was or what was said between the appellant and the people who approached him at the park. Thus, in order to convict the appellant herein on such circumstantial evidence would require the trier of fact to assume that the wadded up paper seen on the video tape was money and that the money was given to the appellant in exchange for a somewhat earlier transfer of a substance that was represented by the appellant to be cocaine. We conclude that there was insufficient evidence of representation that the substance was cocaine, such that every other reasonable hypothesis of guilt is excluded.

Though we have already determined that the evidence is insufficient to support the conviction based on the lack of evidence or representation, we are compelled to address the appellant's other arguments with regards to sufficiency of the evidence. The appellant correctly points out that in prior cases involving charged offenses under the provisions of Tennessee Code Annotated section 39-17-423, the State introduced evidence at trial demonstrating that the substance purchased was tested and shown not to be a controlled substance. See e.g., State v. Gregory Skinner, No. W2003-00336-CCA-R3-CE, 2004 WL 115403, at *2 (Tenn. Crim. App., at Jackson, Jan. 15, 2004) (introducing evidence that substance which the defendant represented to be cocaine tested negative for a controlled substance); State v. Brandon Ronald Crabtree, No. M2002-01470-CCA-R3-CD, 2003 WL 21250852, at *2 (Tenn. Crim. App., at Nashville, May 30, 2003) (determining that substance which defendant represented to be ecstacy was a brown powder packaged in clear capsules which did not contain any controlled substance). In conjunction with this argument, the appellant contends that the heading of Tennessee Code Annotated section 39-17-423, "Counterfeit controlled substances," implies that in order to be convicted of the offense of the sale of a counterfeit controlled substance, the State must show that the substance was in fact counterfeit.

Initially, we note that the question of whether the counterfeit status of the substance is an element of Tennessee Code Annotated section 39-17-423 may have indirectly been decided by this Court in State v. Peter Gunn, No. 02-C01-9511-CR-00352, 1996 WL 551757, at *3 (Tenn. Crim. App., at Jackson, Sept. 13, 1996). In Peter Gunn, this Court determined that "possession of a counterfeit controlled substance" is an element of Tennessee Code Annotated section 39-17-423 and that the sale of a counterfeit drug is not a lesser-included offense of possession with the intent to sell the actual drug. Id.

Further, "[t]he most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995) (emphasis added). This Court is to determine legislative intent "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000). Moreover, the legislature has provided that criminal statutes are to "be construed according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code." Tenn. Code Ann. § 39-11-104; see also State v. Marcum, 109 S.W.3d 300, 303 (Tenn. 2003).

While it is true that Tennessee Code Annotated section 1-3-109 provides that the headings to statutes are not part of the statutes themselves, it is perfectly permissible under widely accepted principles of statutory construction to look to these headings in the quest to determine legislative intent. See, 2A Norman J. Singer, Sutherland's Statutory Construction, § 47:14 (6th ed. 2000). This is particularly true when the heading was part of the public act enacted by the legislature and not merely the code compiler's opinion as to the topic embraced in the statute. Id. The public act adopted by the General Assembly of Tennessee and later codified at section 39-17-423 includes the heading "counterfeit controlled substances" and is therefore not simply the code compiler's opinion. See 1989 Tenn. Public Acts ch. 591 § 1. Thus, the legislature, in its enactment of this statute, must have intended it only to prohibit the sale of "counterfeit" controlled substances.

Secondly, the use in section 39-17-423(a) of the phrase "substantially similar in color, shape, size, and markings or lack thereof, to a Schedule I, II, III or IV controlled substance . . ." indicates that the general assembly intended to punish the sale or delivery of substances that look like, but are not, genuine controlled substances, especially given the maxim of statutory construction that statutes "in pari materia," those relating to the same subject or having a common purpose, are to be construed together. Owens, 908 S.W.2d at 926. Tennessee Code Annotated sections 39-17-401 to -451 are known as the Tennessee Drug Control Act and are a comprehensive scheme designed to regulate the illegal traffic in and use of controlled substances, certain counterfeit substances, and drug paraphernalia. It seems to follow that if a defendant is selling an authentic controlled substance the General Assembly intended that person to be prosecuted for a violation of Tennessee Code Annotated section 39-17-417 and punished in a much more severe fashion than as a Class E felon, the punishment for selling ersatz controlled substances. Consequently, we conclude that the legislative intent embraced in Tennessee Code Annotated sections 39-17-401 to -451 is that individuals who are purveyors of authentic controlled substances should be prosecuted as such. We conclude that the legislature did not intend that such individuals could be punished for the far less serious crime of selling a counterfeit controlled substance.

Thus, we conclude that the evidence is insufficient to support the appellant's convictions for sale of a counterfeit controlled substance.

Evidentiary Rulings

Although our ruling on the sufficiency of the evidence makes the remaining issue moot, we will address it in the event of a further appeal to our supreme court. The appellant argues that the trial court erred in allowing Detective Mynatt to testify about Triangle Park's reputation as a drug-trafficking area and the on-going drug surveillance operation which was conducted in the area during the summer of 2003.

As stated previously, the appellant filed a motion in limine prior to trial to prohibit Detective Mynatt from testifying: (1) that the Kingston Police Department was engaged in an on-going drug surveillance at Triangle Park when the appellant was videotaped; (2) that Triangle Park was "a known drug area or similar wording;" and (3) that other individuals which appeared on the tape at

the same time as the appellant were "known drug dealers or drug users." The trial court denied the appellant's motion without comment. The appellant now challenges the trial court's evidentiary ruling, arguing that Detective Mynatt's characterization of Triangle Park as a known drug-trafficking was not relevant, or, if relevant, that any probative value was substantially outweighed by its prejudicial nature. The State contends essentially that the testimony was relevant to support its theory that the appellant represented his substance to be cocaine. That is, the appellant represented that the substance he sold was cocaine because that is what is sold in Triangle Park. Alternatively, the State argues that any error in the admission of this testimony was harmless.

At trial, Detective Mynatt acknowledged that he made frequent arrests for drugs at Triangle Park. Detective Mynatt explained the reason for the surveillance cameras as follows:

> We've had – ever since I've worked for the Harriman Police Department[,] Triangle Park has been a major problem. And the way it's set up, the location, it's very difficult to watch because it's basically kind of sits on top of a hill. And there's no way to really get in there and observe things without being seen yourself. It's surrounded by residents [sic]. So this kind of operation – or this area is ideal for this type of operation.

Detective Mynatt testified that the Triangle Park surveillance operation was conducted throughout the summer of 2003, and he observed "many" drug purchases by means of the video camera.

Later, the following colloquy occurred between the prosecutor and Detective Mynatt:

[Q]: Okay. Now is it readily obvious to you when these people arrive and come up and hold out money and get something, that they already know what they want? They generally would know the person they're going to get it from?

[A]: Yes.

[Q]: Have some experience with them?

[A]: Yes. Generally you don't come into the Triangle Park area unless that's what you're looking for, unless you live up there. You're either a customer or a seller.

[Q]: Now are there private citizens who live along these streets?

[A]: Yes.

[Q]: And is there a public park kind of across the way from this corner?

[A]:     Probably less than – from where that vehicle was parked, less than 10 feet there's a basketball court.  And then on from that there's slides, swings.  It's a typical park.

During closing argument, the prosecutor submitted, "[i]f you approach this defendant while he's just sitting on top of a car in a public place, and he's handing out little rocks of off-white colored substance and collecting money, and that that's the area where you can go in this county to buy crack cocaine, you know he's representing it to be crack cocaine."

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.  Even relevant evidence, however, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.  "When arriving at a determination to admit or exclude even that evidence which is considered relevant, trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of an abuse of discretion." State v. Saylor, 117 S.W.3d 239, 247 (Tenn. 2003).

In State v. Brown, 915 S.W.2d 3, 7 (Tenn. Crim. App. 1995), this Court observed that evidence may be relevant to show why a police officer was at a particular location, during a particular time, noting that "'[i]n criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct.'" Id. (quoting John Williams Strong McCormick on Evidence, Section 249 at 104 (4th ed. 1992)); see also State v. Ernest E. Pride, No. M2000-00319-CCA-R3-CD, 2001 WL 30214, at *3 (Tenn. Crim. App., at Nashville, Jan. 11, 2001), perm. app. denied, (Tenn. May 7, 2001) (including testimony by police officers who explained their presence at the crime scene by stating that "Edgehill is a high drug trafficking area that the police had targeted because of complaints by neighbors"); State v. Calvin Eugene Head, No. 01C01-9806-CC-00263, 1999 WL 343910, at *3 (Tenn. Crim. App., at Nashville, June 1, 1999) (allowing police officers to testify that the management of the housing association had asked for their assistance in stopping criminal activities conducted by non-residents in the housing project).

The appellant argues that he was convicted "not by any relevant evidence that he was selling counterfeit drugs, but by the reputation of the place where he was being videotaped."  To support his argument, the appellant relies on a series of Florida court decisions finding reversible error from the admission of testimony concerning the "high crime" reputation of the area in which the defendant was apprehended.  See Latimore v. State, 819 So.2d 956, 958-59 (Fla. Dist. Ct. App. 2002) (finding reversible error from police officer's testimony about general criminal reputation of the area instead of personal observations of prior criminal activity); Wheeler v. State, 690 So. 2d 1369, 1371-72 (Fla. Dist. Ct. App. 1997) (finding reversible error from a combination of testimony about the general behavior patterns of drug dealers and the reputation of the area as a high crime area).  As the Latimore Court observed, however, the Florida Supreme Court has "clarified that testimony

characterizing the location of a defendant's arrest as a high-crime area may not always result in undue prejudice and require reversal," and "whether prejudice exists depends on the facts of each case." Latimore, 819 So. 2d at 958 (citing Gillion v. State, 573 So. 2d 810 (Fla. 1991)).

We acknowledge that the theory of "guilt by association" theory that has been "thoroughly discredited." Uphaus v. Wyman, 360 U.S. 72, 79 (1959). Generally, the behavior of others involved in similar criminal activities has no probative value in determining whether a defendant is guilty of the charged offenses. State v. Smith, 42 S.W.3d 101, 112 (Tenn. Crim. App. 2000).

Nonetheless, Detective Mynatt's testimony concerning the surveillance operation established at Triangle Park was relevant to explain why the police officers were in that location and to explain why no arrests were immediately made. See Brown, 915 S.W.2d at 7. Detective Mynatt's testimony that drugs were sold in Triangle Park was based on his personal observations and his experience as the director of the Harriman Police Department's drug unit, and was not simply testimony concerning the park's reputation. Moreover, the testimony was relevant to explain why Triangle Park was chosen as an area of interest to the police. Id. Based on our review of the case sub judice, we conclude that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.

## Conclusion

For the foregoing reasons, the judgment of the trial court is reversed and dismissed.

_____
JERRY L. SMITH, JUDGE

-10-